1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   GREGORY GOSS,

11            Petitioner,                    No. 2: 08-cv-1844 GEB KJN P

12        vs.

13   D.K. SISTO,

14            Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16   I.  Introduction

17            Petitioner is a state prisoner proceeding without counsel with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  In 1992 petitioner was convicted of second degree

19   murder with an enhancement for use of a weapon.  Petitioner is serving a sentence of 16 years to

20   life.

21            In the instant action, petitioner challenges the 2007 decision by the California

22   Board of Parole Hearings ("BPH") finding him unsuitable for parole.  This was petitioner's

23   fourth suitability hearing.  This action is proceeding on the original petition filed by petitioner on

24   August 8, 2008.  Petitioner raises the following claims: 1) insufficient evidence to support the

25   2007 decision; 2) violation of the Ex Post Facto clause.

26   ////

1            After carefully considering the record, the undersigned recommends that the

2 petition be denied.

3   II.  <u>Anti-Terrorism and Effective Death Penalty Act ("AEDPA")</u>

4            In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362 (2000), the Supreme Court defined

5 the operative review standard in a habeas corpus action brought pursuant to 28 U.S.C. § 2254.

6 Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the

7 court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the

8 Supreme Court, and an "unreasonable application of" that law.  <u>Id</u>. at 405.  "Contrary to" clearly

9 established law applies to two situations:  (1) where the state court legal conclusion is opposite

10 that of the Supreme Court on a point of law; or (2) if the state court case is materially

11 indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

12 opposite.

13            "Unreasonable application" of established law, on the other hand, applies to

14 mixed questions of law and fact, that is the application of law to fact where there are no factually

15 on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

16 <u>Id</u>. at 407-08.  It is this prong of the AEDPA standard of review which directs deference be paid

17 to state court decisions.  While the deference is not blindly automatic, "the most important point

18 is that an *unreasonable* application of federal law is different from an incorrect application of

19 law. . . .  [A] federal habeas court may not issue the writ simply because that court concludes in

20 its independent judgment that the relevant state-court decision applied clearly established federal

21 law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id</u>. at 410-

22 11 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

23 objectively unreasonable nature of the state court decision in light of controlling Supreme Court

24 authority.  <u>Woodford v. Viscotti</u>, 537 U.S. 19 (2002).

25            "Clearly established" law is law that has been "squarely addressed" by the United

26 States Supreme Court.  <u>Wright v. Van Patten</u>, 552 U.S. 120 (2008).  Thus, extrapolations of

settled law to unique situations will not qualify as clearly established.  See <u>e.g.</u>, <u>Carey v.</u>
<u>Musladin</u>, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to
inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by
unnecessary showing of uniformed guards does not qualify as clearly established law when
spectators' conduct is the alleged cause of bias injection).

   The state courts need not have cited to federal authority, or even have indicated
awareness of federal authority, in arriving at their decision.  <u>Early v. Packer</u>, 537 U.S. 3 (2002).
Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an
unreasonable application of, established Supreme Court authority.  <u>Id</u>.  An unreasonable error is
one in excess of even a reviewing court's perception that "clear error" has occurred.  <u>Lockyer v.</u>
<u>Andrade</u>, 538 U.S. 63, 75-76 (2003).  Moreover, the established Supreme Court authority
reviewed must be a pronouncement on constitutional principles, or other controlling federal law,
as opposed to a pronouncement of statutes or rules binding only on federal courts.  <u>Early v.</u>
<u>Packer</u>, 537 U.S. at 9.

   However, where the state courts have not addressed the constitutional issue in
dispute in any reasoned opinion, the federal court will independently review the record in
adjudication of that issue.  "Independent review of the record is not de novo review of the
constitutional issue, but rather, the only method by which we can determine whether a silent state
court decision is objectively unreasonable."  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir.
2003).

   When reviewing a state court's summary denial of a claim, the court "looks
through" the summary disposition to the last reasoned decision.  <u>Shackleford v. Hubbard</u>, 234
F.3d 1072, 1079 n.2 (9th Cir. 2000).

////

////

////

1   III.  Analysis

2          A.  Insufficient Evidence

3              In claim one, petitioner alleges that there was insufficient evidence to support the

4   BPH's 2007 decision finding him unsuitable for parole.  The Los Angeles Superior Court issued

5   a reasoned decision finding sufficient evidence to support the 2007 decision by the BPH finding

6   petitioner unsuitable for parole.  (Dkt. No. 1, at 118.)  The California Supreme Court summarily

7   denied petitioner's habeas corpus petition raising this claim.  (Id., at 119.)  Accordingly, the

8   undersigned considers whether the denial of this claim by the Los Angeles Superior Court was an

9   unreasonable application of clearly established Supreme Court authority.

10             The Due Process Clause of the Fourteenth Amendment to the United States

11  Constitution prohibits state action that "deprive[s] a person of life, liberty or property without

12  due process of law."  U .S. Const. amend. XIV, § 2.  A person alleging a due process violation

13  must demonstrate that he or she was deprived of a protected liberty or property interest, and then

14  show that the procedures attendant upon the deprivation were not constitutionally sufficient.

15  Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan,

16  306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due

17  Process Clause itself or from state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987).

18  In the context of parole, the United States Constitution does not, in and of itself, create a

19  protected liberty interest in the receipt of a parole date, even one that has been set.  Jago v. Van

20  Curen, 454 U.S. 14, 17-21 (1981).  However, when a state's statutory parole scheme uses

21  mandatory language, it "'creates a presumption that parole release will be granted' when or

22  unless certain designated findings are made, thereby giving rise to a constitutional liberty

23  interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S.

24  1, 12 (1979)).

25             Under California law, prisoners serving indeterminate prison sentences "may

26  serve up to life in prison, but they become eligible for parole consideration after serving

4

minimum terms of confinement."  In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417

(2005).  Generally, one year prior to an inmate's minimum eligible parole release date, the Board

will set a parole release date "in a manner that will provide uniform terms for offenses of similar

gravity and magnitude in respect to their threat to the public."  In re Lawrence, 44 Cal.4th 1181,

1202, 82 Cal.Rptr.3d 169 (2008) (citing Cal.Penal Code § 3041(a)).  A release date will not be

set, however, if the Board determines "that the gravity of the current convicted offense or

offenses, or the timing and gravity of current or past convicted offense or offenses, is such that

consideration of the public safety requires a more lengthy period of incarceration. . . ."  Cal.

Penal Code § 3041(b).

        California state prisoners who have been sentenced to prison with the possibility

of parole have a clearly established, constitutionally protected liberty interest in receipt of a

parole release date.  Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12); Irons v.

Carey, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing Sass v. Cal. Bd. of Prison Terms, 461 F.3d

1123, 1128 (9th Cir. 2006)); Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); McQuillion,

306 F.3d at 903.

        In the context of parole proceedings, it is well established that inmates are not

guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process

Clause.  See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987).  Nonetheless,

inmates are afforded limited procedural protections.  The Supreme Court has held that a parole

board's procedures are constitutionally adequate so long as the inmate is given an opportunity to

be heard and a decision informing him of the reasons he did not qualify for parole.  Hayward v.

Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (quoting Greenholtz, 442 U.S. at 16).  As a matter of

state constitutional law, denial of parole to California inmates must be supported by "some

evidence" demonstrating future dangerousness.  Hayward, 603 F.3d at 562 (citing In re

Rosencrantz, 29 Cal.4th 616, 128, 128 Cal.Rptr.2d 104 (2002)); see also In re Lawrence, 44

Cal.4th at 1191 (recognizing  the denial of parole must be supported by "some evidence" that an

1    inmate "poses a current risk to public safety"); In re Shaputis, 44 Cal.4th 1241, 1254, 82

2    Cal.Rptr.3d 213 (2008) (same). "California's 'some evidence' requirement is a component of the

3    liberty interest created by the parole system of [the] state," Cooke v. Solis, 606 F.3d 1206, 1213

4    (9th Cir. 2010), and compliance with this evidentiary standard is, therefore, mandated by the

5    federal Due Process Clause. Pearson v. Muntz, 606 F.3d 606, 611 (9th Cir. 2010). Thus, a

6    federal court undertaking review of a "California judicial decision approving the . . . decision

7    rejecting parole" must determine whether the state court's decision "was an 'unreasonable

8    application' of the California 'some evidence' requirement, or was 'based on an unreasonable

9    determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28

10   U.S.C. § 2254(d)(2)).

11          When assessing whether a state parole board's suitability decision was supported

12   by "some evidence," the analysis "is framed by the statutes and regulations governing parole

13   suitability determinations in the relevant state." Irons, 505 F.3d at 851. The court must

14   look to California law to determine what findings are necessary to deem a petitioner unsuitable

15   for parole, and then must review the record to determine whether the state court decision holding

16   that these findings were supported by "some evidence" or whether it constituted an unreasonable

17   application of the "some evidence" principle. Id.

18          Title 15, Section 2402 of the California Code of Regulations sets forth various

19   factors to be considered by the Board in its parole suitability findings for murderers. The

20   regulation is designed to guide the Board's assessment regarding whether the inmate poses an

21   "unreasonable risk of danger to society if released from prison," and thus whether he or she is

22   suitable for parole. In re Lawrence, 44 Cal.4th at 1202. The Board is directed to consider all

23   relevant, reliable information available, including the circumstances of the prisoner's:  social

24   history; past and present mental state; past criminal history, including involvement in other

25   criminal misconduct which is reliably documented; the base and other commitment offenses,

26   including behavior before, during and after the crime; any conditions of treatment or control,

including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.  15 Cal.Code Regs. § 2402(b).

The regulation also lists several specific circumstances which tend to show suitability or unsuitability for parole.  15 Cal. Code Regs. § 2402(c)-(d).  Factors tending to show unsuitability include:

(1) The Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled, or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(15 Cal. Code Regs. § 2402(c).)

////

Factors tending to show suitability include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has guilt of a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

(15 Cal. Code Regs. § 2402(d).)

The overriding concern is public safety, In re Dannenberg, 34 Cal.4th at 1086, and the focus is on the inmate's current dangerousness.  In re Lawrence, 44 Cal.4th at 1205.  Thus, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that a parolee's release would unreasonably endanger public safety.  In re Shaputis, 44 Cal.4th at 1241.  Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability)

8

1  establish unsuitability if, and only if, those circumstances are probative to the determination that

2  a prisoner remains a danger to the public."  In re Lawrence, 44 Cal.4th at 1212.  In other words,

3  there must be some rational nexus between the facts relied upon and the ultimate conclusion that

4  the prisoner continues to be a threat to public safety.  Id. at 1227.

5          The BPH found petitioner unsuitable for parole based on factors related to the

6  commitment offense as well as his criminal history.  In particular, the BPH found that the offense

7  involved multiple victims.  (Dkt. No. 1, at 85 of 119.)  The BPH also found that the offense was

8  carried out in a dispassionate and calculated manner.  (Id., at 86.)  The BPH also found that

9  petitioner had an escalating pattern of criminal conduct.  (Id.)  In order to put these findings in

10  context, the undersigned will set forth the facts related to the commitment offense as discussed at

11  the 2007 hearing:

12        "The record reflects that about 8:30 p.m. on August 10th, 1990,
Tashoma Henderson," that's T-A-S-H-O-M-A Henderson,

13  common spelling, "was outside her residence on East 27th Street in
Los Angeles with Shaquita Thomas," first name S-H-A-Q-U-I-T-

14  A, common spelling Thomas, "Darnell," D-A-R-N-E-L-L "Harris,"
common spelling, "Earl Jones, Clara Harris, and Edgar Jones,

15  when she saw a white van drive down the street followed by a
white Capri or Mustang.

16

17  "Henderson's home is located in a, quotes 'Blood,' end quotes
gang area.  At the time, the Bloods and the Crips were at war with
each other.  After the white car turned the corner, Alprintice

18  Jones," and that's spelling A-L-P-R-I-N-T-I-C-E, "drove up and
parked.  He got out of his car, and the white car reappeared and

19  drove towards them.

20  "As it drove by, it almost stopped, and Henderson saw three men in
the car.  David Jones, no relation, was sitting in the front passenger

21  seat, holding a very long barreled gun out of the window.  Roderic,
parens, Weasel, end parens Grayson," that's G-R-A-Y-S-O-N,

22  "was in the back seat holding a small gun and Appellant was
driving.  All three were members of the 4 Trey Gangster Crips."

23  That's roman numeral or, excuse me, numeral four T-R-E-Y
Gangster Crips.

24

25  "Henderson then heard 17 or 18 shots fired and people were yelling
that they'd been hit.  Alprentice fell to the ground and later died as

26  a result of loss of blood from a gunshot wound to the chest.  Clara
Harris was shot three times in the side and Edgar Jones was shot

twice below his knee."

And as to the prisoner's version, in the current Board report which was prepared by (indiscernible) period Lee, L-E-E, Correctional Counselor One on June 22nd, 2006.  As to the prisoner's version,

"On August 12th, 1990, Los Angeles police officer Edward Ramirez," that's R-A-M-I-R-E-Z, "spoke to Goss.  Goss denied he was involved in the shooting.  The following day, Goss told the officer in a recorded conversation that early in the day of August 10th, 1990, he was with friends, his friends Weasel and Michael Boyd.  They, quotes, 'kicked,' end quotes back, drank, and smoked some weed.

"Later, he learned that his friend David Jones had called.  He returned David's call and then picked him up.  They obtained an AK 47 and already had a .38, since David or Weasel usually carried a .38 all the time.  David and Weasel talked about doing a 'drive-by'," that's in quotes, 'drive-by' is in quotes, "and wanted to shoot some, quotes, 'Bloods,' end quote.

"Goss then drove the two to 27th and Pedro.  As Goss shifted gears, David put out both arms and started shooting.  Goss also heard Weasel shoot two rounds.  They then went around the corner and shot another, quotes, 'Blood Stone,' end quotes gang member named Clayton, who was in a Monte Carlo.

"Goss testified the day before the incident he rented a white Mustang.  The day of the shooting he met his friends David and Roderick, parens, Weasel, end parens and drove to the Central Recreation Center where he saw 'Maboo'," that's in quotes, "the Recreation Director.  Weasel and David got a weapon or two from Fred Brown's house.

"Goss, who had never been a gang member but associated with gang members, asked them what they were going to do.  He told him they were going to shoot up some Bloods because a guy named Danny was tripping with them and they suggested doing a drive-by.  Goss told them he wasn't going.  Weasel and David got into Goss's rental car with their guns and told Goss they would drop him off at 92nd Street and they would use his car.

"He started driving back home and they asked him to go to 27th Street, but they wouldn't – but said they wouldn't do anything.  As Goss drove through the area, he kept saying, quotes, "Don't shoot, don't shoot.  I'm just going to ride back.  Drop me off,' end quotes.  They agreed, but as Goss drove by, they saw a red shirt and began shooting.  Goss was surprised.  It was not his intention to be involved in any shooting.

"On cross-examination, Goss stated that when he initially spoke to

1      the officers, he said he was not the driver.  Later he told them that
Maboo had been driving. Goss admitted that he lied to police about
2      who the driver was.  Then later on, later on tape, he again lied,
saying he didn't know who the driver was.

3

4      "At trial, Goss admitted these statements were taken and that he
had lied to the police.  In an interview with Goss on March 24th,
2000, he confirmed these statements were true."

5

6   (Dkt. No. 1, at 32-36 of 119.)

7          Petitioner's criminal history included no convictions as a juvenile.  (Id.)  As an

8   adult, petitioner had convictions in 1987 for tampering with a vehicle and petty theft.  (Id.)  In

9   1988, petitioner was convicted of sale of cocaine.  (Id., at 37.)

10         The undersigned now considers whether the circumstances of the commitment

11   offense relied on by the BPH were some evidence of petitioner's current dangerousness.  At the

12   outset, the undersigned finds that the BPH properly found that there were multiple victims.  The

13   undersigned also finds that the BPH properly characterized the offense as having been carried out

14   in a dispassionate and calculated manner.  See In re Rico, 171 Cal.App.4th 659, 682-83, 89

15   Cal.Rptr.3d 866 (2009) (drive-by shooting found especially heinous "because it was carried out

16   in a dispassionate manner and was not the result of longstanding stress").

17         The BPH found nothing negative in petitioner's post-commitment record:

18      As to your institutional behavior, you have behaved commendably
in prison.  You have worked and you're now a building porter and
19      actually now a first watch porter.  And you've received good work
reports.  You received your GED in 1995, for which you're to be
20      commended.  You have a vocation in auto body and frame in 1996.
You also have a welding certificate.

21

       You have multiple laudatory chronos that have been read into the
22      file and you have taken part in self-help courses up to the present
time.  In fact, we've read into the record a number of courses that
23      you have taken in 2003, 2004, and 2006, including AA in 2006 and
including courses in Relationship Awareness, Anger Management,
24      Creative Conflict Resolution, and Stress Management.

25      As to misconduct in prison, you have a good record in prison.  You
have no violence or drugs inside.  You have one 115 that was in
26      1997, in which you left a work assignment early, so you have a

11

good record and it shows that you've maintained a positive attitude in prison.

As to the psychological report dated December 6th of 2006 by Dr. P. Davis, he assesses you with a low risk of dangerousness and assigns a global assessment of functioning of 80, which is good.

As to your parole plans, you plan to reside in Los Angeles with your stepmother appears to be a viable plan and to work for your father's former tow truck company.

(Dkt. No. 1, at 86-88 of 119.)

As the California Supreme Court has recognized,

Absent some affirmative evidence of a change in the prisoner's demeanor and mental state, the circumstances of the commitment offense may continue to be probative of the prisoner's dangerousness for some time in the future. *At some point*, however, when there is affirmative evidence, based upon the prisoner's subsequent behavior and current mental state, that the prisoner, if released, would not currently be dangerous, his or her past offense may no longer realistically constitute a reliable or accurate indicator of the prisoner's current dangerousness.

Lawrence, 44 Cal.4th at 1219, 82 Cal.Rptr.3d 169 (emphasis added).

Whether the circumstances of petitioner's commitment offense continued to demonstrate that he remained a current danger is a close call based on his good prison record. However, at the time of the 2007 suitability hearing, petitioner had been in prison for 15 years. The 2007 suitability hearing was his fourth suitability hearing. Based on these facts, the undersigned finds that the decision of the Los Angeles County Superior Court that the circumstances of petitioner's commitment offense constituted some evidence of his current dangerousness was not an unreasonable application of clearly established Supreme Court authority. (See Dkt. 15-2, at 3-4.) However, *at some point*, the circumstances of petitioner's commitment offense will no longer be evidence of his current dangerousness so long as he

1  continues his positive prison programming.[1]

2  　　　　　The BPH also relied on petitioner's criminal record in finding him unsuitable.  As

3  discussed above, petitioner had convictions for tampering with a vehicle, petty theft and sale of

4  cocaine.  These convictions did not involve violence.  See  15 Cal. Code Regs. § 2402(c)(2),

5  (d)(6).  For that reason, the undersigned does not find any nexus between petitioner's criminal

6  history and the BPH's conclusion that petitioner continued to be a threat to public safety.

7  　　　　　Because there was some evidence supporting the 2007 decision by the BPH that

8  petitioner continued to be a threat to public safety, this claim should be denied.

9  　　　　　B.  Ex Post Facto

10  　　　　　Petitioner argues that his life sentence has been altered by the BPH to resemble a

11  sentence of life without the possibility of parole in violation of the Ex Post Facto clause.

12  　　　　　 The Ex Post Facto Clause "is aimed at laws that 'retroactively alter the definition

13  of crimes or increase the punishment for criminal acts.'"  Cal. Dep't of Corr. v. Morales, 514 U.S.

14  499, 504-05 (1995).  Petitioner points to no change in law that has been applied to him

15  retroactively, and his original sentence of 16 years to life has not been altered.  Petitioner fails to

16  state a valid claim under the Ex Post Facto Clause.

17  　　　　　After conducing an AEDPA review, the undersigned recommends that this claim

18  be denied.

19  IV.  Conclusion

20  　　　　　The undersigned recommends that petitioner's application for a writ of habeas

21  corpus be denied.  If petitioner files objections, he shall also address whether a certificate of

22  appealability should issue and, if so, why and as to which issues.  A certificate of appealability

23

24  　　　[1]  Although the BPH did not find petitioner unsuitable on this ground, it noted that he had
an 812 form in his C file indicating that he was a validated member of the Central Style Player

25  Crips. (Dkt. No. 1, at 54 of 119.)  Petitioner stated that he did not know the form was in his file
and denied that he was a gang member.  (Id.)  The BPH advised petitioner to have this form

26  addressed before his next suitability hearing.  (Id., at 54 and 91 of 119.)

1  may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the

2  denial of a constitutional right."  28 U.S.C. § 2253(c)(3).

3           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

4  writ of habeas corpus be denied.

5           These findings and recommendations are submitted to the United States District

6  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

7  one days after being served with these findings and recommendations, any party may file written

8  objections with the court and serve a copy on all parties.  Such a document should be captioned

9  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

10  objections shall be filed and served within fourteen days after service of the objections.  The

11  parties are advised that failure to file objections within the specified time may waive the right to

12  appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

13  DATED:  September 30, 2010

14

15

16

17  KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

18  goss1844.157

19

20

21

22

23

24

25

26